815 F.2d 77
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Yvonne DRAPER, Plaintiff-Appellant,
v.
Kenneth D. TATE, Tate and Company, Inc., Al H. Thomas,
Individually, Jack L. Halliburton, Individually, Larry A.
Weissman, Individually, and Thomas Halliburton and Weissman,
a Partnership, Defendants-Appellees.
 No. 86-5170.
 United States Court of Appeals, Sixth Circuit.
 Feb. 27, 1987.
 
 Before JONES, Circuit Judge, and CELEBREZZE and PECK, Senior Circuit Judges.
 NATHANIAL JONES, Circuit Judge.
 
 
 1
 Plaintiff, Yvonne Draper, appeals the district court's judgment affirming the bankruptcy court's decision in this suit based upon breach of contract, negligence, and fraud. Because we find no error below, we affirm.
 
 
 2
 The facts found by the bankruptcy court are as follows. In the spring of 1980, defendant Kenneth D. Tate ("Tate"), as president of the defendant corporation, Tate & Company, Inc, set up a real estate project for which an individual named Harold E. Griffin ("Griffin") would find investors in California to invest in the purchase and sale of real estate by Tate & Company in Memphis, Tennessee. Griffin would receive a "finder's fee" for providing investors.
 
 
 3
 In July 1980, the plaintiff contacted Griffin and an associate of Griffin named Francis T. Impey ("Impey") and stated that she was interested in making an investment in the real estate enterprise of Tate & Company in Memphis. On June 24, 1980, Impey brought an agreement to the plaintiff's home, which had already been signed by Tate as president of Tate & Company. The plaintiff signed the agreement. The agreement stated that the plaintiff would invest $175,000, that Tate & company would buy real property in the name of the plaintiff, that the plaintiff would sell the property to Tate & Company or its nominees within 120 days from the date of the agreement, and that the plaintiff would receive a net return equal to sixty percent per annum on her cash investment. Impey noted at the bottom of the agreement that the total profit for the plaintiff would be $34,524, and Griffin guaranteed the transaction and the payment to the plaintiff.
 
 
 4
 In October 1980, Tate & Company purchased three parcels of property in the plaintiff's name. On November 19, 1980, defendant Larry Weissman ("Weissman"), an attorney for the company, prepared deeds to transfer the plaintiff's three properties to Tate & Company and sent letters, deeds, and checks to the plaintiff in care of Mustafa Management Services. Because of past problems in getting deeds signed and returned promptly when mailed directly to the investors, Weissman had been instructed by Tate & Company to mail the deeds and checks to Ms. Draper in care of Mustafa Management Services, which was operated by Griffin and Impey. Griffin was supposed to deliver the checks, have the investor sign the deeds, and return the deeds to Weissman for recording.
 
 
 5
 Griffin had the plaintiff sign the deeds on December 2, 1980, but the checks were not given to her. Instead, the signature of the plaintiff was forged on the three checks from Tate & Company, and the checks were deposited into a bank account styled "Fran Impey Financial Management Systems." The bank credited these checks to Impey and Griffin's account immediately rather than waiting for them to clear. In the meantime, Griffin and Impey persuaded the plaintiff to accept a promissory note from Savoy Plaza Limited Partnership ("Savoy Plaza") for $198,000 plus 14 percent interest per annum. The note, signed by Impey as president of Savoy Plaza, and a check for $19,524 from Griffin were given to plaintiff after she was falsely told that her checks on the sales of her properties had not yet been delivered by Tate & Company. During the next two months the plaintiff received several checks from Savoy Plaza which netted the plaintiff approximately $43,000. The deeds that had been signed by the plaintiff were returned to Weissman and recorded in Shelby County, Tennessee, on December 12, 1980.
 
 
 6
 Tate & Company had issued, on November 21, 1980, three checks to Weissman on the three properties mentioned above. Those checks were deposited in a special account of Thomas, Halliburton & Weissman ("attorneys") designated for Tate & Company real estate transactions. On December 15, 1982, Weissman was notified by Union Planters Bank of Memphis that the attorneys' special bank account was frozen because several checks of Tate & Company, subsequent to those issued for plaintiff's properties, had been returned for insufficient funds. On December 19, 1980, Weissman stopped payment on some outstanding cheeks payable from the account. The three forged checks at issue were returned to Griffin's bank for insufficient funds the first two times they were presented to Union Planters Bank. This occurred because the subsequent checks written on the special bank account in the ordinary course of business had depleted the account, and the subsequent checks of Tate & Company to be deposited had been insufficient and returned, thus not increasing the balance of the account.
 
 
 7
 Weissman mailed letters to certain investors including the plaintiff on December 19, 1980, informing them that the checks for repurchase were uncollectable and so the deeds would be returned. The plaintiff called Weissman on December 22, 1980, and told him that she had been paid. He therefore turned two of the deeds over to Tate & Company. The plaintiff called Weissman again on January 14, 1981, when she began having trouble collecting money from Savoy Plaza and Griffin.
 
 
 8
 Although the bankruptcy court's findings of fact do not go beyond this point, it seems that in the course of that January conversation plaintiff realized that she had been duped by her investment consultants, Griffin and Impey. In February she filed suit against Impey and Savoy Plaza for recovery of the balance due on the note. Four days later, she filed the instant suit against Tate, Tate & Company, and its attorneys. The case was removed to bankruptcy court after Tate & Company filed its Chapter 11 petition.
 
 
 9
 The bankruptcy court held that Tate was not individually liable for his company's debt, but that Tate & Company had been unjustly enriched since it never paid for the checks it issued to plaintiff. It held that the company's law firm and its members were not liable since they had acted reasonably, and since the checks and the deeds had been duly delivered, although third parties frustrated plaintiff's receipt of them. The court held that the attorneys could not be held liable for the fraudulent acts of third parties outside of their control.
 
 
 10
 The district court affirmed the bankruptcy court's decision, but noted that the bankruptcy court's use of an unjust enrichment theory indicated that no express contract existed between plaintiff and Taft & Company. It therefore concluded that plaintiff had substituted an agreement with Griffin for her previous contract with Taft & Company when she accepted Griffins' promissory note.
 
 
 11
 Plaintiff's first argument on appeal is that the district court's finding of a substitute agreement was both improper and erroneous, and so this court should find that there was a breach of the express agreement. The district court believed that the bankruptcy court could not have awarded equitable relief if an express contract still existed between plaintiff and Tate & Company. Accordingly, the district court held that the bankruptcy court must have implicitly held that there was a substitute contract or "novation," replacing Tate & Company with Griffin as the obligor. While we disagree that an award under an unjust enrichment theory necessarily precludes the existence of an express contract, we do agree with the district court that the factual findings of the bankruptcy court support the legal conclusion that a novation took place.
 
 
 12
 "A novation is a substituted contract that includes as a party one who was neither the obligor or [sic] the obligee of the original duty." Restatement (Second) of Contracts Sec. 280 (1981). In order to form a novation, the obligee of the original duty and the obligor of the new duty must assent, but the obligor of the old duty need not assent. Id. comment c. Thus, in the case at hand, Tate & Company need not have expressed its intention that Griffin take over its obligations to Ms. Draper. To hold that both Ms. Draper and Mr. Griffin assented to a novation, the district court pointed to Ms. Draper's representation to Tate & Company's attorney that she had been paid for her property, when what she had received was the promissory note and a check from Griffin. The note and the check from Griffin were for the same amount that Tate & Company owed her. Plaintiff argues that the note and the check were accepted conditionally as additional security, and so a novation did not take place. See id. comment d. However, Ms. Draper's assurances to Tate & Company's attorney that she had been paid belie her assertion that she intended to hold Tate & Company responsible for payment in addition to Griffin.
 
 
 13
 Plaintiff correctly points out that a substitute contract is voidable for fraud like any other contract. However, a substitute contract continues to discharge the original obligor's duty until avoidance, id. Sec. 279 comment b, and plaintiff has not sought to void her agreement with Griffin and Impey. To the contrary, she filed suit to enforce the agreement.
 
 
 14
 Although we therefore agree with the district court that the bankruptcy court's decision can be affirmed on the basis that a novation took place, we note that the bankrutpcy court's decision would also be valid in the absence of a novation. The district court correctly stated that "recovery on a theory of unjust enrichment or quasi-contract generally is not permitted where an express contract covers the same subject." J. App. 87. The policy behind this rule is that upon breach of an express contract parties should be governed by the terms to which they agreed rather than by subjective evaluations of the value of each party's performance. See Hunter, Modern Law of Contracts p 9.01 (1986). However, in this case the bankruptcy court seems to have believed that Taft & Company technically complied with the express agreement: "Tate & Company issued a check for the purchase of the three parcels of property and ... the check was deposited in a special bank account ...." J. App. at 66. Finding no breach of the express agreement, the bankruptcy court properly turned to the equitable principle of unjust enrichment to hold Tate & Company liable for the money that it had never actually paid and that Ms. Draper had never actually received.
 
 
 15
 Plaintiff next argues on appeal that Tate & Company's attorneys breached various duties which they owed to her. The alleged negligence basically consisted of the attorneys' manner of maintaining their bank account and their sending plaintiff's checks to her in care of her financial consultants. The bankruptcy court found that the attorneys acted reasonably, and we agree. Contrary to plaintiff's beliefs, an attorney is not an insurer or guarantor of the results of her work, but rather is required to exercise such skill, care, and diligence as individuals in the legal profession commonly possess. In re Woods, 358 Tenn. 283, 289, 13 S.W.2d 800, 803 (1929). Plaintiff also argues that the attorneys are liable for the fraudulent acts of Griffin and Impey on the grounds that Griffin and Impey were the attorneys' agents. However, as the district court noted, if anything, Griffin and Impey were plaintiff's agents. They had handled her financial matters and investments many times in the past, and she had originally given them her money to forward to Tate & Company. At the direction of the company, the attorneys wrote the checks to the plaintiff, and merely sent them in care of Griffin and Impey. There is no reason to hold the attorneys responsible for the fraud of plaintiff's investment counselors.
 
 
 16
 Finally, plaintiff argues that Mr. Tate, the president of Tate & Company, should be found individually liable for negligence. The bankruptcy court, however, made the factual finding "that Tate acted not individually, but instead in his capacity as president of the corporation...." J. App. at 66. This finding was not clearly erroneous.
 
 
 17
 Accordingly, we AFFIRM the district court.